UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

Deborah Smith,

    Plaintiff,

        v.                       Case No. 1:06cv207

Good Samaritan Hospital,            Judge Michael R. Barrett

    Defendant.

**OPINION & ORDER**

    This matter is before the Court upon Defendant Good Samaritan Hospital's ("Good Samaritan") Motion for Summary Judgment. (Doc. 23) The Plaintiff Deborah Smith having filed a Response in Opposition (Doc. 34), and Good Samaritan having filed a Reply (Doc. 35), this matter is now ripe for review.

**I.    BACKGROUND**

    Smith, an African-American, began working for Good Samaritan as a Food Service Worker in 1972. (Doc. 25, Deborah Smith Depo. at 18) Smith remained in this position until her termination in 2005. (Id. at 18-19) Smith was approximately 57 years old at the time of her termination. (Id. at 13)

    There appears to be no dispute that Smith's job performance was satisfactory. (Doc. 27, Rose Schumacher Depo. at 82; Doc. 28, John R. Fuqua Depo. at 154-55) However, throughout Smith's thirty-three year tenure, Good Samaritan disciplined Smith for her behavior. (Smith Depo., Exs. 3-7, 12, 15, 16, 25, 30, 39)

    Good Samaritan has in place a progressive discipline policy which includes an initial, informal verbal counseling, a recorded verbal warning, and a written warning. (Doc. 26, Melinda Amrein Depo. at 111-112; Schumacher Depo. at 26-29) If these steps do not

resolve an issue, Good Samaritan subjects an employee to a "Decision-making Day," which amounts to a final warning. (Amrein Depo. at 112) However, progressive discipline steps only remain active for twelve months. (Amrein Depo. at 135, 146; Schumacher Depo. Ex. 2; Schumacher Depo. at 30) The only exception is when there is a pattern of poor behavior. (Amrein Depo. at 135)

In 1990, Smith received a written warning for grabbing a learning-challenged co-worker from behind and physically lifting her off the ground. (Smith Depo. at 23; Ex. 3) Between 1990 and 1993, Smith received several warnings and a three-day suspension for taking food from the kitchen without permission. (Id. at 26-7; Ex. 4)

In April of 1993, Smith received a "final letter of warning" from Supervisor Frederika Richardson. (Id., Ex. 4) Smith had made an inappropriate gesture to one co-worker and used unacceptable language during a confrontation with another. (Id.) The letter warns that "any similar infractions will result in immediate request for your termination of employment with Good Samaritan Hospital." (Id.)

In June of 2001, Smith received a verbal reminder for an incident involving a co-worker, Delores Drinks, in which Smith again used inappropriate language and gestures. (Id. at 30; Ex. 5) In December of 2001, Smith received a written reminder when Drinks reported that Smith forcefully bumped her and she felt threatened by Smith. (Id., Ex. 6)

In January of 2002, Smith received a verbal reminder after a health inspector reported that he saw Smith wipe her nose then proceed with her work in the kitchen without washing her hands. (Id., Ex. 7) On January 16, 2002, during a department meeting, Supervisor Carlos Crump informed Smith and her co-workers of the Hospital's rule against

keying a "no lunch" on the time clock.  (Id., Ex. 12)  The next day, Smith entered a "no lunch" on her time card without approval.  (Id.)  As a result, Smith was issued a verbal warning.  (Id.)  On January 8 and January 29, 2002, Smith received two additional warnings for "misrepresentation" and "unprofessional behavior."  (Id.)

On January 11, 2002, Smith called the Work Place Alert Line, a "hotline" for reporting workplace concerns, about her warnings.  (Id. at 54, 58; Ex. 10-12)  Smith also filed a "Problem Solving Request" with Good Samaritan's Human Resources department.  (Id., Ex. 13)  Problem Solving Requests are used by employees to make complaints about working conditions.  (Doc. 29, Jaeschke Depo. at 19)  Smith believed she had been denied an opportunity to "discuss" her misconduct before being issued discipline.  (Smith Depo. at 82-83, 91; Ex. 13)  In her Problem Solving Request, Smith asked to be called into the office to confront any co-worker who reported her misconduct.  Smith also requested that the Hospital treat reports or complaints from "third parties" as "frivolous" unless those parties were willing to confront her directly in an initial discussion.  (Id., Ex. 13)

Melinda Amrein, an Employee Relations Consultant for Good Samaritan, investigated each of the incidents for which Smith received discipline.  (Id. at 98-99)  Amrein ultimately recommended the removal of Smith's January 8 and January 29, 2002 warnings because she was unable to find a non-management eye-witness to substantiate Smith's misconduct.  (Doc. 23-3, Jaeschke Dec. ¶ 8)  While the investigation was pending, Smith was issued another verbal warning for eating in the serving area, a violation of the Hospital's sanitation guidelines.  (Id., Ex. 15)

In January of 2004, Smith received a Decision-making Day suspension after an investigation confirmed a co-worker's complaints of inappropriate conduct and sexual

harassment by Smith.  (Id., Ex. 16)  The complaint arose after an incident when Smith argued and used foul language with a male co-worker, Andre Burk, and called him "pretty boy." (Id. 124-26)  During the investigation, Smith admitted calling Burk "pretty boy" for months before the confrontation.  (Id.)  Burk's supervisor, Scott Walters, and Smith's manager, Rose Schumacher, jointly issued Smith a Decision-making Day suspension and warned her that "any future unprofessional behavior or violation of TriHealth's[1] policies or procedures will result in termination."  (Id.)  Walters and Schumacher also encouraged Smith to contact Concern, the hospital's employee assistance program, for help with conforming her behavior and maintaining a professional composure.  (Id.)

Smith returned from her Decision-making Day suspension and provided Walters and Schumacher with a written commitment to conform her behavior.  (Id., Ex. 17)  Although she admitted to the altercation and to calling Burk "pretty boy" during the investigation, in her memo, she contended that the statements against her were lies and that the incident did not warrant discipline.  (Id.)

In April of 2004, Smith took five weeks of FMLA leave to recover from pneumonia. On May 25, 2004, Supervisor Mildrena Hill asked Smith to clean a refrigerator in the nutrition services area.  (Id. at 186)  Because of her recent illness, Smith asked a co-worker to clean the refrigerator.  (Id.)[2]  Good Samaritan contends that same day, Smith was overheard by a cook saying that the "food here looks like crap and tastes like

---

[1]Good Samaritan Hospital is a part of the TriHealth health system.

[2]Smith maintains that she asked Hill if she "[c]ould I ask the person whose job it is, would they clean it out for me?"  (Smith Depo. at 186)  Smith contends that a few days later Hill and Lee got together and agreed to say that Smith told Hill that she would not clean the refrigerator.  (Id. at 187)

garbage." (Id., Ex. 21) Smith admits that she made a negative remark about the food, but that it was not directed at anyone and was in reference to the diet she was on while she was a patient. (Id. at 192-95)

Lee discussed the situation with Schumacher, who had already learned of Smith's failure to follow Hill's direction. (Schumacher Dep. 23) Together, they concluded that Smith's conduct violated the hospital's code of conduct and that her ongoing pattern of inappropriate behavior warranted discharge. (Id. at 78; Smith Depo., Ex. 21)

On June 2, 2004, Good Samaritan terminated Smith's employment. (Smith Depo., Ex. 21) Smith appealed her termination through Good Samaritan's internal appeals process. (Id., Ex. 22) Smith contended that the negative behaviors cited in her termination letter were lies "contrived" against her. (Smith Depo. at 205; Ex. 22) Smith stated that Hill lied about her refusal to clean the refrigerator and her prior disciplinary warnings were aimed at "shutting [her] up" because she openly gave her opinion about the way work was performed and "how it could be done better." (Id. 198, 205-07) A panel of neutral managers and staff recommended that the termination be rescinded. (Amrein Depo. at 132)[3] Vice President of Human Resources, Walter McLarty, reviewed the panel's recommendation and agreed to reinstate Smith to her former position over management's objection. (Smith Depo. at 229) However, McLarty directed that Smith receive a Decision-making Day suspension for the incidents that led to her termination. (Id., Ex. 25) Smith contends that this was contrary to the panel's recommendation that she be "made whole." (Id. at 230)

---

[3]It appears that there is no record of the reasons the panel recommended rescinding the termination. (Doc. 27, Schumacher Depo. at 115-16; Amrein Depo. at 126-129)

In December of 2004, Smith placed a co-worker's wallet in her pocket and left the area without informing anyone that she had taken the wallet. (Id. 235-36; Ex. 29) The co-worker returned to the area to retrieve her wallet, and became frantic and started yelling in distress when it was missing. (Id. at 238) Other co-workers came to the area to assist her. (Id.) Smith eventually returned the wallet. (Id.) Schumacher heard about the problem, and conducted an investigation with Amrein. (Schumacher Depo. at 118) Smith admitted that she had taken the wallet but said she did not intend to steal it. (Smith Depo. at 242) According to Schumacher, Smith said she wanted to teach her co-worker a lesson about leaving her belongings lying around. (Schumacher Depo. at 118) Schumacher and Amrein also learned that Smith said at the scene that she should "just steal from her ass" and "I should have robbed you." (Smith Depo., Ex. 30) Schumacher concluded that Smith did not intend to steal the wallet. (Id.) Although Schumacher could have terminated Smith for her misbehavior, she chose to be lenient because Smith was seeing a counselor at Concern. (Id.) Schumacher again warned Smith that "one more incident regarding inappropriate behavior whether minor or major will result in termination." (Id.)

In April of 2005, Smith told her supervisor that a co-worker, Isaac Howard, was not bringing carts to her area as required, but instead leaving them down the hall. (Id. at 252) Schumacher and Hill discussed the problem with Howard but did not tell him that Smith had reported the issue. (Schumacher Depo. 153) During their meeting, Howard reported that Smith was taking unauthorized breaks. (Smith Depo. at 253) Schumacher and Hill then called Smith into the office to discuss this allegation. (Id.) Several days later, Howard and Smith separately met with Amrein in Human Resources to file Problem Solving Requests about the meetings. (Id. at 255) In her Problem Solving Request, Smith stated:

Please note the following violations of TriHealth policies outlined that I am reporting being committed against me.

First I would liek to call your attention to: Code of Ethical Business and professional behavior which reads: It embodies the promise of Tri-Health to adhere to all pertinent laws and regulations. It is the policy of Tri-Health to comply with all applicable federal, state and local laws . . .

. . .

At issue is how can anything I (or any other employee) report in private to a supervisor or manager be relayed or communicated to any other employee(s) outside of a formal disciplinary hearing. I contend that pitting employees against each other is not only possibly placing the employees in imminent danger but these lapses in communication are illegal, unethical and criminal.

(Smith Depo., Ex. 34)  In his Problem Solving Request, Howard stated that he was "tired of being harassed by management and by coworkers." (Schumacher Depo., Ex. 11) Howard explained that he had learned that "Rose [Schumacher] and Mil[drena Hill] lied on me and Debbie Smith to get us to conflict with each other and tell on each other." (Id.)

Because both Problem Solving Requests arose from the same incident, Amrein consolidated her investigation of the matter. (Amrein Depo. at 26)  Amrein met with each employee to collect information and to solicit the names of other employees who might shed some light on the issue. (Id.)  Smith told Amrein that Schumacher and Hill told Howard that she reported him. (Smith Depo. at 258; Amrein Depo. at 15)

Amrein and Nutrition Director John Fuqua interviewed six of Smith's co-workers and the managers who Smith had been accused of "pitting" employees against each other. (Amrein Depo. at 23)  None of Smith's co-workers confirmed her allegations. (Amrein Depo. at 23)  Amrein and Fuqua met a second time, separately, with Howard and Smith. (Amrein Depo. at 23; Fuqua Depo. at 16)  Amrein and Fuqua asked Howard whether

Schumacher or Hill told him that Smith reported the cart issue.  (Fuqua Depo. at 97)

Howard verified that they had not mentioned Smith by name during their meeting about the

carts.  (Id.)

Amrein and Fuqua concluded that Smith's supervisors had acted appropriately.

(Amrein Depo., Ex. 96)  They informed Smith that their investigation did not substantiate

her claims.  (Smith Depo., Ex. 38)  Amrein and Fuqua also concluded that Smith had

misrepresented the facts when she stated that the managers were "pitting" employees

against each other.  (Amrein Depo. at 97-98; Fuqua Depo. at 35-36; Smith Depo. at Ex.

39)

In May of 2005, Smith was bumped by a cart being pushed by a co-worker. (Smith

Depo. at 265)  Smith later filed a report with Good Samaritan's Security office stating that

her co-worker had "intentionally" hit her "twice" in the back with the cart. (Id.,  Ex. 36)

Smith also met with Fuqua about the incident and gave him a letter that stated:

> On Thursday May 12th, 2005 I was in the kitchen at the end of the trayline
> when Delores swung a cart around and hit me with it.  I said, "Ouch" and
> waited on a response from Delores Taylor, instead I was struck again in my
> lower back and side.  I was like in shock for a minute.  When I came to my
> senses, I said to Delores and I quote "Delores you cannot keep disrespecting
> me" the least you can do is to say I'm sorry or excuse me.  I do not
> disrespect you like that and you shouldn't do that to me, while the
> supervisors act like they don't see you.  While I was telling Delores that she
> was wrong, she became very irate.  I don't know what she was saying.  It
> definitely wasn't I'm sorry or excuse me.  Cornelia Purcell and Patricia
> Durham was standing right there.

(Id., Ex. 37)  Fuqua spoke with the employees who were working in the area when the

incident occurred, including Purcell and Durham.  (Fuqua Depo. at 133; Jaeschke Depo.,

Ex. 3; Amrein Depo., Ex 4)  One employee stated that she saw the cart hit Smith once, but

she believed it was accidental.  (Fuqua Depo. at 142)  None of the employees confirmed

that Smith had been hit twice, or that she had been hit intentionally. (Fuqua Depo. at 142) Fuqua concluded that Smith had misrepresented the facts, and should therefore receive disciplinary action. (Id. at 111) Since it had been less than twelve months since Smith received a Decision-making Day suspension,[4] Fuqua decided that discharge was appropriate. (Id. at 175) Fuqua discussed his findings and his decision to terminate Smith with Amrein, who agreed that termination was appropriate. (Id. at 28-29) Fuqua terminated Smith's employment on June 13, 2005. (Smith Depo., Ex. 39) Smith appealed her termination, but the panel upheld her termination. (Id. at 282-87) Smith was replaced by a Caucasian who was born in 1962. (Doc. 34-1)

In her Amended Complaint, Smith brings claims of (1) gender discrimination in violation of Title VII, 42 U.S.C. § 2000e, *et seq.* and Ohio Revised Code § 4112.02; (2) retaliation in violation of Title VII and Ohio Revised Code § 4112.02(I); (3) age discrimination in violation of the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 623(a) and Ohio Revised Code § 4112; (4) race discrimination in violation of Ohio Revised Code § 4112; (5) retaliation and termination in violation of Family Medical Leave Act, 29 U.S.C. § 2615(a)(2); and breach of Ohio public policy. Smith does not oppose Good Samaritan's Motion in so far as it addresses her claims of gender discrimination and violation of Ohio public policy, and therefore summary judgment will be granted in Good Samaritan's favor on these claims.

---

[4]Smith contends that her previous Decision-making Day suspension was wrongly issued, and therefore there would have not been any grounds to terminate her.

## II.    ANALYSIS

### A.    Summary Judgment Standard

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).  The moving party has the burden of showing an absence of evidence to support the non-moving party's case.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).   Once the moving party has met its burden of production, the non-moving party cannot rest on his pleadings, but must present significant probative evidence in support of his complaint to defeat the motion for summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986).  The mere existence of a scintilla of evidence to support the non-moving party's position will be insufficient; the evidence must be sufficient for a jury to reasonably find in favor of the non-moving party. *Id.* at 252.  However, a court must view the evidence and draw all reasonable inferences in favor of the nonmoving party.  *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, (1986).

### B.    Race discrimination

Title VII makes it unlawful for an employer "to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin."   42 U.S.C. § 2000e-2(a)(1).  The Ohio Supreme Court has held that "federal case law interpreting Title VII of the Civil Rights Act of 1964 is generally applicable to cases involving alleged violations of R.C. Chapter 4112."

*Plumbers & Steamfitters Joint Apprenticeship Comm. v. Ohio Civil Rights Comm'n*, 421 N.E.2d 128, 131 (Ohio 1981).[5]

In a case alleging employment discrimination in violation of Title VII, a plaintiff can withstand a motion for summary judgment either by presenting direct evidence of discrimination or circumstantial evidence from which a jury may infer a discriminatory motive. *Rallins v. Ohio State University*, 191 F.Supp.2d 920, 928 (S.D. Ohio 2002), *citing*, *Kline v. Tennessee Valley Authority*, 128 F.3d 337, 348-49 (6th Cir.1997).

Because Smith has not presented direct evidence of race discrimination, her claim is properly analyzed under the *McDonnell Douglas* framework. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1972). To establish a *prima facie* case of discrimination under Title VII, a plaintiff must show that (1) he or she was a member of a protected class; (2) he or she suffered an adverse employment action; (3) he or she was qualified for the position; and (4) he or she was replaced by someone outside the protected class or was treated differently than similarly-situated, non-protected employees. *DiCarlo v. Potter*, 358 F.3d 408, 415 (6th Cir. 2004).

If the plaintiff succeeds in establishing a *prima facie* case, an inference of discrimination arises, and the burden then shifts to the defendant to articulate some legitimate nondiscriminatory reason for its actions. *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 254-56 (1981). If the defendant articulates a nondiscriminatory reason for its actions, the plaintiff must then have an opportunity to prove by a preponderance of the evidence that the legitimate reasons put forth by the defendant were

---

[5]Smith's Amended Complaint only states a claim for race discrimination pursuant to state law (Count V). However, the Parties have addressed this claim as if it were brought based upon both Title VII and Ohio law.

not its true reasons but were a mere pretext for discrimination.  *McDonnell Douglas*, 411 U.S. at 802.  The plaintiff may prove pretext by showing either that: (1) the proffered reason had no basis in fact, (2) the proffered reason did not actually motivate the adverse action, or (3) the proffered reason was insufficient to motivate the adverse action.  *Manzer v. Diamond Shamrock Chemicals Co.*, 29 F.3d 1078, 1084 (6th Cir.1994).  The ultimate burden of persuading the trier of fact that the employer intentionally discriminated against her remains at all times with the plaintiff.  *Burdine*, 450 U.S. at 253.

There appears to be no dispute that Smith is able to meet the first three elements of the *prima facie* case.  As to the fourth element, Smith has not identified any similarly-situated, non-protected employees who were treated differently, but Smith has presented evidence that she was replaced by a Caucasian.  Therefore, the Court finds that Smith has established a *prima facie* case of race discrimination.

Good Samaritan claims that Smith's termination was warranted due to her continued pattern of unacceptable behavior and her misrepresentations.  Smith argues that this articulated reason has no basis in fact, or was insufficient to motivate her termination.

Smith's arguments regarding pretext focus on Good Samaritan's second stated reason for Smith's termination–Smith's misrepresentations.  Good Samaritan criticizes Smith for failing to address the other stated reason–Smith's pattern of unacceptable behavior.  However, as this Court has recently explained, a number of circuit courts have held that when an employer offers multiple reasons for discharging a plaintiff, that plaintiff need only discredit one of the proffered reasons.  *May v. Pilot Travel Centers, LLC*, 2007 WL 108001, *6 (S.D.Ohio Jan. 5, 2007) (slip op.), *citing Powell v. Rumsfeld*, 2002 WL 1752233, at *3 (7th Cir. July 24, 2002) (quoting Russell v. Acme-Evans Co., 51 F.3d 64,

70 (7th Cir. 1995) ("there may be cases where the multiple reasons offered by the defendant 'are so intertwined, or the pretextual character of one of them so fishy and suspicious, that the plaintiff could withstand summary judgment' by showing the pretextual nature of just one reason."); *Bryant v. Farmers Ins. Exchange*, 432 F.3d 1114, 1127 (10th Cir. 2005) (holding that discrediting one proffered reason, such as the dominant reason, can cast doubt on all remaining reasons, even if they have not been discredited). Therefore, in this case, a showing that one of the stated reasons–Smith's misrepresentations–is pretextual, will cast doubt upon Good Samaritan's other stated reason–the pattern of unacceptable behavior.[6]

As to the cited misrepresentations, Smith points out that Howard also complained about the supervisors. Smith also questions whether Fuqua and Amrein interviewed the proper witnesses to determine the truthfulness of Smith's statements about her supervisors. Regarding the incident with the cart, Smith claims that there were witnesses that saw Smith being hit by a cart at least once, but Fuqua and Amrein ignored these statements in determining Smith had misrepresented the facts.

The Sixth Circuit has held that a plaintiff cannot show pretext by merely disputing the allegations or questioning the validity of the defendant's investigation. *Braithwaite v.*

---

[6]The Court notes, however, while it was not argued in her Response in Opposition, throughout her deposition Smith disputes that the instances of unacceptable behavior ever occurred or occurred as Good Samaritan has indicated in her employment records. In addition, the Court notes that Smith appealed her first termination, which was rescinded, but shows she disputed the basis for her termination. However, the Court also notes that this Court does not have a duty to search the entire record to establish that there is no material issue of fact. *Karnes v. Runyon*, 912 F.Supp. 280, 283 (S.D.Ohio 1995); *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479-80 (6th Cir. 1989). The non-moving party must designate those portions of the record with enough specificity that the Court can readily identify those facts upon which the non-moving party relies. *Karnes*, 912 F.Supp. at 283.

*Timken Company*, 258 F.3d 488, 493 (6th Cir. 2001).   Instead, a plaintiff must "put forth evidence which demonstrates that the employer did not 'honestly believe' in the proffered non-discriminatory reason for its adverse employment action."  *Id.* at 494, *citing Smith v. Chrysler*, 155 F.3d 799, 806-807 (6th Cir. 1998).

In order to determine whether the defendant had an "honest belief" in the proffered basis for the adverse employment action, a court must consider whether the employer can establish its "reasonable reliance" on the particularized facts that were before it at the time the decision was made.  *Id.*  The Sixth Circuit has explained:

> In deciding whether an employer reasonably relied on the particularized facts then before it, we do not require that the decisional process used by the employer be optimal or that it left no stone unturned.  Rather, the key inquiry is whether the employer made a reasonably informed and considered decision before taking an adverse employment action.

*Smith*, 155 F.3d at 807.  "When the employee is able to produce sufficient evidence to establish that the employer failed to make a reasonably informed and considered decision before taking its adverse employment action, thereby making its decisional process 'unworthy of credence,' then any reliance placed by the employer in such a process cannot be said to be honestly held."  *Id.* at 807-808.  However, this Court must not second guess the business judgment of the employer, but simply evaluate "whether the employer gave an honest explanation of its behavior."  *Hedrick v. W. Res. Care Sys.*, 355 F.3d 444, 462 (6th Cir. 2004).

The Court finds that Smith has not shown Good Samaritan failed to make a reasonably informed and considered decision before terminating her employment.  The Court notes that in both instances where Good Samaritan found that Smith made misrepresentations, there was an extensive investigation.  Amrein met with both Smith and

Howard regarding the incident involving the supervisors.  Amrein and Fuqua interviewed six co-workers and the supervisors, and then met again with Smith and Howard.  After Smith claimed she was intentionally hit with a cart by a co-worker, Fuqua reviewed Smith's statements and interviewed co-workers who were working the in the area when the incident occurred.  Smith was then able to appeal her termination based upon the misrepresentations, but the panel upheld her termination.  There is nothing in the record which would indicate that Good Samaritan's decisional process is unworthy of credence, and accordingly, the Court cannot find that Good Samaritan's proffered reasons for Smith's termination were not honestly held.  Because Smith has not shown that the reasons were a mere pretext for discrimination, Good Samaritan is entitled to summary judgment on Smith's claim of race discrimination.

## C.  Age discrimination

The ADEA prohibits employers from discriminating "against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age."  29 U.S.C. § 623(a).  The *McDonnell Douglas* burden-shifting framework for circumstantial-evidence cases has been applied in the context of claims brought under the ADEA.  *Grosjean v. First Energy Corp.*, 349 F.3d 332, 335 (6th Cir. 2003).  This Court has held that cases interpreting the ADEA are applicable to a claim of age discrimination under Ohio law.  *Williams v. General Elec. Co.*, 269 F.Supp.2d 958, 966 (S.D. Ohio 2003), *citing City of Columbus Civil Serv. Comm'n v. McGlone*, 697 N.E.2d 204, 206-07 (Ohio 1998); *Cochran v. Columbia Gas of Ohio, Inc.*, 742 N.E.2d 734, 738 (Ohio 2000).

In order to establish a *prima facie* case of age discrimination using circumstantial

evidence under the *McDonnell Douglas* framework, a plaintiff must show that: (1) he or she is a member of the protected class, that is, he or she is at least forty years of age; (2) he or she was subjected to an adverse employment action; (3) he or she was qualified for the position; and (4) he or she was treated differently from similarly situated employees outside the protected class.  *Mitchell v. Vanderbilt University*, 389 F.3d 177, 181 (6th Cir. 2004).

Even if the Court concludes that Smith is able to establish a *prima facie* case of age discrimination, the Court has already found that for the reasons stated in the analysis of Smith's race discrimination claim, Smith has not shown that Good Samaritan's proffered reasons for her termination were pretext for discrimination.

However, to support her age discrimination claim Smith argues that the employees influencing the decision to terminate her harbored notions about her behavior based on stereotypical views of older workers.  Smith points to: (1) a comment she heard Hill make about "old black women keeping up trouble" (Smith Depo. at 295-296); Amrein's comment in her deposition that Smith "couldn't change" (Amrein Depo. at 114-15)[7] and Jaeschke's comments in her deposition that Smith was "set in her ways" and refused to change

---

[7]In discussing what she saw as a pattern of problems with Smith's behavior, Amrein stated:

A. She couldn't change.

. . .

She continued her pattern of behavior, and that's the thing that we look at, is that, you know, as far as the changing process, is that we really want our employees to be successful in their positions, and that would be, as far as with their behavior performance and -- you know, in meeting with them, we want to state the specifics of, you know, what happened, what is the -- what occurred, what was brought you to, you know, our attention.  . . .

(Amrein Depo. at 114-15)

(Jaeschke Depo. at 60).[8]

"Congress'[s] promulgation of the ADEA was prompted by its concern that older workers were being deprived of employment on the basis of inaccurate and stigmatizing stereotypes." *Hazen Paper Co. v. Biggins*, 507 U.S. 604, 610 (1993). In age discrimination cases, statements allegedly showing an employer's age bias are to be evaluated by considering four factors: (1) whether the statements were made by a

---

[8]In light of the context of the testimony, Jaeschke was not referring to Smith's age in commenting that Smith was "set in her ways" and refused to change:

A:      . . . All told, it was time for Debbie to go someplace else, because she had been given numerous chances throughout her years of employment. She probably could have been terminated 20 times, and everyone always gave her another chance. This most recent time, she was sent to Concern Counseling to help her to develop her interpersonal-relationship skills. She refused to change. We can't afford to allow people like that to work in our workplace, disrupt the environment, and mistreat our employees. That's not the type of workplace that we condone or strive to have at TriHealth.

. . .

Q:      Oh. So by this point, by this time, Debbie had become pretty set in her ways?

A:      After 32 years, yes, I think you could say that.

Q:      And that's why she couldn't change, right?

A:      I'm assuming she chose not to change. It was her choice. She had plenty of chances to do so and never demonstrated any desire to change, certainly never even verbalized it.

Q:      You can't teach an old dog new tricks, right?

A:      That's your words, not mine.

Q:      Well, after 32 years --

A:      You know, if anything, the fact that she was a long-term employee gave her numerous other chances that a shorter-term employee never would have gotten.

(Jaeschke Depo. at 60-61)

decision-maker or by an agent within the scope of his employment; (2) whether the statements were related to the decision-making process; (3) whether the statements were more than merely vague, ambiguous or isolated remarks; and (4) whether they were made proximate in time to the act of termination. *Peters v. Lincoln Elec. Co.*, 285 F.3d 456, 477-78 (6th Cir. 2002), *citing Cooley v. Carmike Cinemas, Inc.*, 25 F.3d 1325, 1330 (6th Cir. 1994). None of these factors is individually dispositive of age discrimination, but rather, they must be evaluated as a whole, taking all of the circumstances into account. *Id.*

Even if Hill's comment was admissible as nonhearsay, there is no indication in the record that Hill was involved in the decision to terminate Smith's employment. Moreover, Smith testified that she did not know when the comment was made, and that she only thought that it was directed to her. (Smith Depo. at 295-97) As for the comments by Jaeschke and Amrein, this Court has previously found that comments which are made merely to indicate performance-based impressions and could apply to an employee of any age cannot form the basis of an age discrimination claim. *Conley v. U.S. Bank Nat. Ass'n*, 2005 WL 2459258, *5 (S.D.Ohio Oct. 4, 2005) (unpublished) (holding that statements that plaintiff "lacked initiative," was "not setting the world on fire," and was not a "go-getter" were not related to plaintiff's age and do not demonstrate "ageist stereotypes"), *aff'd*, 2006 WL 3690209, *4 (6th Cir. Dec. 12, 2006) (unpublished). The Court finds that the comments that Smith "couldn't change" or was "set in her ways" and refused to change are related to Smith's performance and could apply to an employee of any age. Therefore, the Court finds that Good Samaritan is entitled to summary judgment on Smith's claim of age discrimination.

### D.    Retaliation under Title VII

A plaintiff must make out a *prima facie* case of retaliation under Title VII by establishing four elements: (1) the plaintiff engaged in an activity protected by Title VII; (2) the defendant knew that the plaintiff exercised his or her rights; (3) the defendant took an employment action against the plaintiff that a reasonable employee would have found materially adverse; and (4) there was a causal connection between the protected activity and the adverse employment action. *Burlington Northern and Santa Fe Ry. Co. v. White*, 126 S.Ct. 2405, 2415 (2006).

Good Samaritan argues that Smith cannot establish that she was engaged in protected activity. "Protected activity" refers to opposing any practice made unlawful under Title VII, or making a charge, testifying, assisting, or participating in any manner in an investigation, proceeding, or hearing under Title VII. 42 U.S.C. § 2000e-3(a). As evidence of protected activity, Smith points to her April of 2005 Problem Solving Request which references violations of state and federal rights.  Smith argues that because Amrein approached her investigation of Smith's request as if it were based upon discrimination and harassment, Smith was engaged in protected activity.  The Court notes that while Smith makes a general reference about state and federal rights, her April of 2005 Problem Solving Request makes no specific mention of any practice made unlawful under Title VII, nor is there a reference to any protected category.  Even if the Court accepts Smith's novel theory that Smith was engaged in protected activity because Good Samaritan perceived her as being engaged in protected activity, the Court finds that Smith has not shown that there was a causal connection between any activity and her termination.

To establish a causal connection, a plaintiff must produce sufficient evidence from

which an inference could be drawn that the adverse action would not have been taken had the plaintiff not filed a discriminatory action.  *Nguyen v. City of Cleveland*, 229 F.3d 559, 563 (6th Cir. 2000).  Causation can be inferred from indirect or circumstantial evidence, such as "evidence that defendant treated the plaintiff differently from similarly situated employees or that the adverse action was taken shortly after the plaintiff's exercise of protected rights."  *Id.*

Smith relies on the temporal proximity of her Problem Solving Request and termination.  However, proof of such temporal proximity between the protected activity and the adverse employment action, must be "coupled with other indicia of retaliatory conduct," to give rise to a finding of a causal connection.  *Dixon v. Gonzales*,  481 F.3d 324, 333 (6th Cir. 2007), *quoting Randolph v. Ohio Dep't of Youth Servs*., 453 F.3d 724, 737 (6th Cir. 2006).  Smith has not pointed to any other indicia of retaliatory conduct.  Moreover, there is no evidence that Good Samaritan would not have terminated Smith if she had not submitted her Problem Solving Request.  While Good Samaritan based Smith's termination on misrepresentations she made in the Problem Solving Request, it was also based upon misrepresentations she made in reporting the incident with the cart, as well as her continued pattern of unacceptable behavior.

Good Samaritan argues that even if Smith is able to establish a *prima facie* case, Smith cannot establish that these stated reasons for her termination were pretextual.  The Court agrees.  As discussed above in analyzing both Smith's claim for race discrimination and her claim for age discrimination, Smith has not shown that Good Samaritan's stated reasons for her termination were factually false, insufficient to warrant discharge, or did not actually motivate its decision.  Therefore, the Court finds that Good Samaritan is entitled

to summary judgment on Smith's claim of retaliation under Title VII.

### E.   FMLA

The Sixth Circuit recognizes "two distinct theories of recovery under the FMLA:  (1) the 'entitlement' or 'interference' theory arising from 29 U.S.C. § 2615(a)(1); and (2) the 'retaliation' or 'discrimination' theory arising under 29 U.S.C. § 2615(a)(2)."  *Hoge v. Honda of America Mfg., Inc.*, 384 F.3d 238, 244 (6th Cir. 2003).  Smith relies upon the retaliation theory.

The Sixth Circuit has held that the *McDonnell-Douglas* burden-shifting framework should be applied to FMLA retaliation claims that are based upon indirect evidence. *Gibson v. City of Louisville*, 336 F.3d 511, 513 (6th Cir. 2003), *citing*, *Skrjanc v. Great Lakes Power Service Co.*, 272 F.3d 309 (6th Cir. 2001).  To establish a *prima facie* case of retaliation under the FMLA, a plaintiff must establish: (1) that he or she engaged in a statutorily protected activity; (2) that the employer knew of his or her protected activity; (3) that he or she suffered an adverse employment action; and (3) that a causal connection existed between his protected activity and the adverse employment action.  *Skrjanc*, 272 F.3d at 314.   The employer then has the burden of articulating a legitimate nondiscriminatory reason for the adverse employment action.  *Gibson*, 336 F.3d at 513. Finally, the plaintiff must show that this nondiscriminatory reason was in fact pretextual and that unlawful discrimination was the real reason for the adverse action.  *Id.*

Good Samaritan argues that Smith cannot show a causal connection between her FMLA leave in April of 2004 and the termination of her employment in June of 2005.  Smith again relies on the temporal proximity.  Even if the Court were to accept that the thirteen months between Smith's FMLA leave and her termination were sufficiently close in time,

or that her first termination–on June 2, 2004–is the relevant adverse employment decision, temporal proximity is not, in and of itself, enough to prove pretext. *Skrjanc*, 272 F.3d at 317. Furthermore, "[e]vidence that the employer had been concerned about a problem before the employee engaged in the protected activity undercuts the significance of the temporal proximity." *Sosby v. Miller Brewing Co.*, 415 F.Supp.2d 809, 822 (S.D.Ohio 2005), *quoting Smith v. Allen Health Sys.*, 302 F.3d 827, 834 (8th Cir. 2002).

Moreover, the Court does not accept Smith's argument that evidence of pretext exists because Good Samaritan's own appellate panel determined that Smith should not have been terminated in June of 2005. While there is no dispute that the panel recommended that Smith's termination be rescinded, there is no evidence as to the basis for this decision. For this reason, and the reasons stated above regarding Smith's failure to show that Good Samaritan's stated reasons for terminating Smith's employment are pretextual, the Court finds that Good Samaritan is entitled to summary judgment on Smith's claim of retaliation under the FMLA.

## III. **CONCLUSION**

Based on the foregoing, Defendant Good Samaritan's Motion for Summary Judgment (Doc. 23) is hereby **GRANTED**. This matter shall be closed and terminated from the docket of this Court.

**IT IS SO ORDERED.**

   */s/ Michael R. Barrett*       
Michael R. Barrett, Judge
United States District Court
